# In the United States Court of Federal Claims

No. 15-1256C
(Filed under seal May 9, 2016)
(Reissued May 17, 2016)†

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
\*
**RES REI DEVELOPMENT, INC.,**   \*
\*
       Plaintiff,   \*
\*
   v.   \*
\*
**THE UNITED STATES,**   \*
\*
       Defendant,   \*
\*
   and   \*
\*
**ST. MICHAEL'S INC. and**
**FEDERAL ACQUISITION**
**SERVICES TEAM, LLC,**   \*
\*
       Defendant-Intervenors.   \*
\*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Pre-award bid protest; exclusion from competitive range; SOCOM; Government Control exception, 48 C.F.R. § 52.215-1(c)(3)(ii)(A)(2); *Blue & Gold Fleet*; offeror responsible for proposal errors; interpretation of solicitation terms; past performance of individuals not evaluated; no substantial chance of inclusion.

*Joseph J. Zito*, DNL ZITO, with whom was *Luiz Felipe Oliveira*, both of Washington, D.C, for plaintiff.

*Lauren S. Moore,* Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Benjamin C. Mizer*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Martin F. Hockey, Jr.*, Assistant Director, all of Washington, D.C., for defendant. *Major Jason R. Smith*, Department of the

---

† The parties were given the opportunity to request redactions, and only defendant did so. As requested, the names of offerors other than Res Rei have been redacted (replaced with letters), as were the names of agency officials participating in the on-going evaluation process, and price data. The ratings given to offerors, and some ordinal price information, are retained, as these are non-protectable and similar information appears in a public filing of defendant. The opinion is reissued for publication with a couple of minor, non-substantive corrections.

Air Force, Joint Base Andrews, Maryland, and *Craig S. McCaa*, United States Special Operations Command, MacDill Air Force Base, Florida, of counsel.

*Sheridan L. England*, of Washington, D.C., for Defendant-Intervenor Federal Acquisition Services Team, LLC.

## OPINION

WOLSKI, Judge.

This is a pre-award protest of a procurement being conducted by the United States Special Operations Command (SOCOM or the agency). Plaintiff Res Rei Development, Inc. (Res Rei) primarily challenges four aspects of the agency's determination to exclude its proposal from the competitive range, concerning the receipt and evaluation of proposals. Plaintiff and defendant have both filed motions for judgment on the administrative record. For the reasons stated below, defendant's motion is **GRANTED** and plaintiff's motion is **DENIED**.

## I.  BACKGROUND

This procurement is one of three related procurements through which the agency seeks to award SOCOM Wide Mission Support (SWMS) contracts, to provide support services to SOCOM's headquarters, Components and Theater Special Operations Commands. *See* Admin. R. (AR) at 26–30. These services range from engineering and technical assistance to education and training. AR at 26. The agency divided the required services into three separate procurements for awarding the SWMS contracts --- the Groups A, B, and C procurements. AR at 30–31.

### A.  The Solicitation

This protest concerns the Group C procurement. Work which presents a significant risk of industry organizational conflicts of interest is to be assigned through this contract, covering engineering and technical, management support, professional, and administrative support services. *Id.* The Group C contract was set aside for service-disabled veteran-owned small businesses. *See* AR at 31, 667 (incorporating by reference 48 C.F. R. § 52.219-27). On July 30, 2014, SOCOM issued Solicitation H92222-14-R-0019 (the solicitation) requesting proposals for the SWMS Group C contract. AR at 653. The procurement will result in the award of a single indefinite-delivery/indefinite-quantity (IDIQ) contract, with task orders to be issued on a cost-plus-fixed-fee basis. AR at 663, 667 (incorporating by reference 48 C.F.R. §§ 52.216-7, 52.216-8), 686. That contract will have a five-year ordering period and a ceiling value of $150,000,000. AR at 654–55.

In an amendment to the solicitation, potential offerors were instructed:

> Offeror shall submit its proposal by email only to SWMS@socom.mil. Paper or other media will not be accepted.  Identify the RFP # in the Subject line.  Your email submission should include four separate attached files: Volume I, Volume II, Volume III, and Volume IV.  DO NOT ATTACH ZIP FILES OR EXECUTABLE FILES.  Only submit one proposal per offeror, multiple proposals will not be accepted.  The max size of any files coming through on any one email is 20MB.  If needed you may send multiple emails; ensure they are clearly identified.

AR at 928–29.  Another amendment to the solicitation set the final deadline for proposal submissions as September 15, 2014, at 4:30 Eastern Daylight Time.  *Id.* at 985.[1]

The solicitation called for the submission of four separate volumes by each offeror.  AR at 1083.  The first three volumes corresponded with the three evaluation factors, and the fourth was to contain administrative material, such as contractor representations and certifications.  AR at 1083, 1087–88.  The solicitation informed offerors that there were three evaluation factors:  Factor 1 was the Technical factor, Factor 2 was Past Performance, and Factor 3 was Proposal Cost.  AR at 1083–86.  A best value tradeoff analysis was to be employed.  AR at 1089.  The factors were listed in descending order of importance, and when combined the non-cost factors (Factors 1 and 2) were "significantly more important than cost."  *Id.*  For the technical factors, the agency employed a color and adjectival rating system using the following ratings, in order of descending quality: Blue/Outstanding, Purple/Good, Green/Acceptable, Yellow/Marginal, and Red/Unacceptable.  AR at 1090–91.  The Past Performance ratings ranged from No Confidence to Substantial Confidence, with a neutral, Unknown Confidence rating to be assigned to offerors with a "sparse" or non-existent "recent/relevant performance record."  AR at 1091.  Each offeror was instructed that its "proposal should not simply rephrase or restate the Government's requirements, but shall address how the Offeror intends to meet these requirements."  AR at 1082.

The Technical factor contained two sub-factors, with the first more important than the second.  AR at 1089.  Sub-factor 1 was Program Management.  AR at 1083–84, 1089–90.  Each offeror was instructed to "provide a description and supporting rationale which demonstrates its capability to effectively manage contract administration," including how it would "implement and maintain a

---

[1] This amendment also deleted the fourth sentence of the instruction, which referred to each volume as a separate file.  *See* AR at 985.

management structure," and various procedures, processes, and plans. AR at 1084. Sub-factor 1 was to be evaluated using eight criteria, including three which considered the "proposed management approach," two which gauged the effectiveness of proposed processes for meeting certain requirements and recruiting, retaining, and training personnel, and two covering the plans for mitigating conflicts and quality control. AR at 1089–90.

Sub-factor 2 under the Technical factor required a Task Order Management Plan (TOMP) for each of two equally-weighted task orders. *See* AR at 1090. Offerors were instructed that "[a]t a minimum, the TOMP for each task order must address" key personnel; "their management approach for transitioning the task order from the incumbent contractor," including "procedures and policies" and "flexibility"; and "metrics for gauging the quality of service provided." AR at 1084–85. They were further instructed to "demonstrate their task order technical approach to execute all of the requirements in accordance with the attached" statements of work, and "demonstrate the ability to meet the requirements without introducing unacceptable risk." AR at 1085.

The first TOMP, Sub-factor 2a, concerned Special Operation Research and Development Acquisition Center (SORDAC) Support, *id.*, and was described in a Statement of Work (SOW) as requiring four separate subtasks covering twenty different functions, detailed in 235 paragraphs, *see* AR at 1119–34. The other TOMP, Sub-factor 2b, was for Special Operations Financial Management (SOFM) Budget Formulation & Financial Support. AR at 1085. The SOFM SOW required the performance of three different functions described in 22 paragraphs. *See* AR at 1145–49. Both SOWs required a single point of contact, called a Task Lead, who was among the contractor's key personnel and was responsible for "day-to-day administration and management of project tasks," including staff assignment and supervision, resource allocation to meet requirements, and quality checks. AR at 1118–19, 1144–45.

Concerning Sub-factor 2, the agency told each offeror that it "will evaluate the offeror's technical approach to managing and executing each of the task orders," and would combine the color rating for each TOMP "to form an aggregate color rating." AR at 1090. The "Personnel" criterion stated: "For each [Task Order], offeror demonstrates an ability to effectively manage and execute the requirements outlined in the SOW, providing appropriate insight and functional expertise. The personnel proposed demonstrates an understanding of the requirement without introducing unacceptable risk." *Id.* The "Transition Plan" criterion evaluated whether the "plan demonstrates a sound management approach to execute a realistic, organized, seamless and timely task order transition," and "demonstrates effectively interfacing with the Government during transition." *Id.* And under the "Quality" criterion the agency considered whether "proposed task order metrics demonstrate the offeror's ability to maintain an inspection system that is integrated

into the overall management approach and meets the requirements of the SOW." *Id.*

The Past Performance volume submitted by an offeror was to contain a maximum of five "Past Performance Information (PPI) Sheets" and "Past Performance Questionnaires (PPQ)," each set "with an emphasis on the prime offeror." AR at 1085–86. These were to be based on contracts performed within the past five years, and "to be considered relevant, the effort must have been performed by the same division or corporate business unit that is proposing to perform under this requirement." AR at 1086. The agency informed offerors that it would decide whether a contract was relevant or not, with relevant meaning an "effort involved similar scope and magnitude of effort and complexities" as the solicitation required, and not relevant assigned when an "effort involved little or none of the scope and magnitude of effort and complexities" so required. *Id.* The evaluation of Past Performance was to be confined to efforts found relevant, and would "consider[] the offeror's demonstrated record of performance in providing services and products the same as or similar to those spelled out in the SOW as either a Prime contractor or a subcontractor." AR at 1091.

## B. Res Rei's Submission Difficulties

Although offerors were told that files totaling as many as 20 megabytes could "com[e] through on any one email," AR at 1083, this proved not to be the case. As the Court found in the protest brought by intervenor Federal Acquisition Services Team, LLC (FAST), the agency server rejected the e-mailed proposals of at least five offerors because a size limit was exceeded, although the attached files were measured to be smaller than 20 megabytes when sent. *Fed. Acquisition Servs. Team, LLC* (FAST) *v. United States*, 124 Fed. Cl. 690, 705 (2016).[2] Res Rei was one of those offerors. *Id.* at 698–99 (identified as Offeror L).

During the evening of Saturday, September 13, 2014, Res Rei first attempted to submit its proposal to the e-mail address listed in the solicitation, with each of the four volumes attached to a separate e-mail. *See* AR at 1217. Although the file containing Volume I, addressing the Technical factor, measured 15 megabytes when the e-mail was sent, Res Rei's Chief Executive Officer (CEO) received a delivery failure notice a few minutes later with the stated reason "size limit exceeded." *Id.*

---

[2] Since portions of the *FAST* administrative record contained evidence concerning the ability of the agency servers to receive e-mailed proposals, these documents were added to the administrative record of this case. *See* Order (Nov. 25, 2015) at 1–2. These materials, when cited, will be referenced as "FAST AR," using the page numbers assigned in that case.

He immediately sent an e-mail to the Contracting Officer (CO) to inform her of the problem and request assistance.  *Id.*

At 7:39 in the morning on Monday, September 15, 2014, the CO responded: "Please try to resubmit to <u>swms@socom.mil</u>."  FAST AR at 864.[3]  Within two hours, Res Rei informed the CO that changing "SWMS" to lowercase resulted in the e-mails containing Volumes II, III, and IV of its proposal going through, but that a delivery receipt for the Technical factor volume had not yet arrived.  *Id.*  Res Rei's CEO reiterated that the Volume I file was only 15 megabytes.  *Id.*  At 9:43 a.m., Res Rei received another delivery failure notice for the Volume I e-mail, which again gave the reason as "size limit exceeded."  AR at 1213.  Immediately after this attempt failed, Res Rei again e-mailed the CO advising her of the problem, stating once more that "[t]he file size is 15MB," and requesting assistance.  *Id.*  Six minutes later, at 9:51 a.m., the CO advised Res Rei to "[p]lease try submitting the document in multiple emails."  AR at 1215.

Forty-two minutes later, Res Rei's CEO responded that the offeror was "working to get the file size smaller than 15 MB," and asked if the CO knew "what the actual limit is?"  AR at 1211.  Res Rei's CEO added:

> Also to make sure I understand correctly, this email contains my entire Volume I PDF file only.  Are you asking me to break this file up into more than one PDF and transmit it?  If so, and if I cannot get the single file smaller, how should I label the emails to ensure each section is identified adequately for reassembly into the Volume I document?  This unfortunately will drastically alter the presentation of my Volume I.

*Id.*

Within fifteen minutes the CO responded, conveying her belief that she was "able to accept files less than 20MB" and could thus not understand Res Rei's problem.  AR at 1209.  She noted that she "cleaned out the swms@socom.mil mailbox," suggested that files be separated by sub-factors, and added:  "Please try reducing the size first."  AR at 1209.  More than one hour later, at 11:56 a.m., Res Rei informed the CO that it was "able to shrink the file by more than 1 MB," and had "received a delivery receipt" for the Volume I e-mail.  AR at 1207; *see also* AR at 1206 (e-mail conveying Volume I received at SOCOM mailbox at 11:56 a.m.).

Other than eliminating two blank pages used to divide separate sections, it is not clear what approach Res Rei took to reduce the size of this portion of its

---

[3]  All times in this opinion refer to Eastern Daylight Time.  Res Rei's CEO was apparently located in the Mountain Time zone.

proposal.  But what is clear is that in this process, two mistakes were made.  First, the information from Figure 3-7, a graphic addressing the requirements of a subtask under the SORDAC task order, was repeated in Figure 3-16, in place of information addressing the requirements of the SOFM task order.  *Compare* AR 1287 (Figure 3-7), 1301 (Figure 3-16 depicting same information) *with* Suppl. to Admin. R. (ECF No. 28) at 81 (original version of proposal showing different data in Figure 3-16).  Second, the tail end of the résumé of one of Res Rei's proposed key personnel was deleted, eliminating knowledge required for the position.  *Compare* Suppl. to the Admin. R. (ECF No. 28) at 87 (the "Working Knowledge" section of Ms. Domenech's résumé in original version of proposal) *with* AR at 1307 (no "Working Knowledge" section in proposal evaluated); *see also* AR at 1152 (requirements for Senior Level Budget/Finance Analyst and Task Lead Analyst).[4]

## C.  Proposal Evaluations

The agency timely received proposals from 16 offerors in response to the solicitation.  This includes the proposal submitted by intervenor FAST, as the Court ruled in FAST's protest that SOCOM should have accepted this proposal under the "Government Control exception" of the Federal Acquisition Regulation (FAR), 48 C.F.R. § 52.215-1(c)(3)(ii)(A)(2).  *See FAST*, 124 Fed. Cl. at 703–05.  This also includes a proposal submitted by [Offeror O], which the agency accepted under the Government Control exception after it was received only at the e-mail address of a SOCOM employee.  *See* AR at 3304–05; Attach. 2 to Order (Nov. 17, 2015), ECF No. 29-2, at 3 (¶1.b of CO's Answers to Written Dep. Questions).[5]

The agency initially evaluated all of these proposals except for FAST's, and determined that only one of them warranted inclusion in the competitive range.  *See* AR at 1576–80, 1593–96, 1977.  As a result of a protest before the Government Accountability Office (GAO) and the FAST protest in our court, the competitive range was ultimately expanded to eight offerors.  *See* AR at 1602–07, 2579–82.  Res Rei was not included in either the initial or expanded competitive ranges.

The Source Selection Evaluation Board (SSEB) initially assigned Res Rei the color rating of Green for technical Sub-factor 1, the Program Management proposal.

---

[4]  As a mere six words plus the section number "C.4" were deleted from the résumé, it is obvious that this was not done intentionally to reduce the amount of data.

[5]  The employee who received the proposal, [Mr. X], apparently served as an advisor to the Source Selection Evaluation Board for this procurement.  *See* AR at 72–73.

AR at 1440.[6]  The description of the rating matched the color given, as the SSEB found the proposal "met the requirements . . . and demonstrated an adequate approach and understanding of program management."  *Id.*; *see also* AR at 1090 (describing Green rating, in part, as "[p]roposal meets requirements and indicates an adequate approach and understanding of the requirements").  Instead of the adjectival rating "Acceptable," which corresponds with Green, AR at 1090, the SSEB assigned the color Purple's "Good," AR at 1440.  The SSEB identified one strength, the use of a "dedicated Transition Manager," *id.*, and one weakness or risk --- whether one of the key employees, Charles Gossage, "can adequately manage [his] duties given the breadth of his responsibilities," AR at 1441.  Although the evaluators were supposed to follow the FAR definitions of "weakness" and "significant weakness," *see* AR at 77, the "weakness" relating to Mr. Gossage was described as "a flaw that appreciably increases the risk of unsuccessful contract performance," AR at 1441, mirroring the definition of a "significant weakness," *see* 48 C.F.R. § 15.001.

By the time the SSEB finalized its initial evaluation report and presented this report to the Source Selection Authority (SSA), the concern over Mr. Gossage's ability to manage his various duties was determined to be a significant weakness, matching the description of that issue as "a flaw in the proposal that appreciably increases the risk of unsuccessful contract performance."  AR at 1557; *see also* AR at 1511 (defining a significant weakness).  Res Rei's proposed use of a dedicated Transition Manager was highlighted in the report, although it was not specifically described as a "strength"--- the SSEB merely stated it "will benefit the government during contract and task order transition."  AR at 1557.[7]  An uncertainty over Res Rei's ability to obtain a facility clearance, noted in the earlier SSEB document, *see* AR at 1441, was included in the report, AR at 1557 --- although in Annex L, one of the "detailed evaluation write-ups" upon which the report was based, the SSEB stated "[t]here were no . . . uncertainties identified," AR at 1581.

In the evaluation report, the SSEB assigned a Yellow/Marginal rating to Res Rei under Sub-factor 1, finding that the Program Management portion of the proposal "does not clearly meet the requirements outlined in the RFP and does not

---

[6]  This document, identified as "Appendix L Offeror L" to the Initial SSEB Evaluation Report, is undated.  *See* AR at 1440–52.  According to the index to the Administrative Record, it was a "Caucus Report" from December 10, 2014.

[7]  The counterpart to the earlier evaluation document, *see* n.6 *supra*, Annex L to the report presented to the SSA, described this feature as a strength, finding it "an aspect of the offeror's proposal that has merit and is advantageous to the government during contract performance."  AR at 1581; *see also* AR at 1511 (defining a strength).

demonstrate an adequate approach or understanding of program management requirements." AR at 1556.[8] Presumably, this rating downgrade from the earlier document was based on the issue concerning the scope of Mr. Gossage's duties being reclassified as a significant weakness, as the description of Yellow/Marginal includes that "[t]he proposal has one or more weaknesses which are not offset by strengths," and that "[r]isk of unsuccessful performance is high." *See* AR at 1090, 1512. This conclusion is not explained, however, and in the narrative underlying it --- in addition to the strength, significant weakness, and uncertainty already discussed --- the SSEB noted that Res Rei's "management approach demonstrated an adequate ability to effectively execute the management of the overall contract" and "demonstrated that its processes are acceptable for meeting the IDIQ SOW requirements"; that it was "satisfactory" regarding security clearances and "demonstrated an effective process for recruitment, retention and training of qualified personnel"; that "an understanding of the requirements and the effort required to effectively manage the IDIQ contract" was demonstrated by the résumés of key personnel; that the OCI approach was sufficient; and that the Quality Control Plan used an "effective quality control approach and adequate measures to ensure quality and timeliness." AR at 1557.[9]

Concerning Technical Sub-factor 2, in both the earlier evaluation document and in the report to the SSA, the SSEB assigned a Red/Unacceptable rating to Res Rei in the aggregate and for each of the two TOMPs. AR at 1440–49, 1557–59, 1581–88. As we will see, the only significant change from the SSEB's first evaluation document was the downgrading of one aspect of the proposal under Sub-factor 2b. Overall, the Unacceptable rating was "due to deficiencies and failures to address numerous requirements outlined in the" two TOMP SOWs, which "resulted in the proposal failing to adequately demonstrate a comprehensive understanding" of them. AR at 1556. This "combination of deficiencies" thus "led to a material failure to meet all requirements in the RFP, would require a major rewrite . . . to be acceptable," and "increase[d] risk of unsuccessful performance to an unacceptable level." *Id.*

Under Technical Sub-factor 2a, the TOMP for the SORDAC task order, the SSEB found one strength, as Res Rei's Task Lead's résumé exceeded educational

---

[8] In Annex L, the SSEB erroneously stated that the Yellow/Marginal rating was warranted because the proposal "met the requirements outlined in the RFP and demonstrated an exceptional approach and understanding of program management," which is the description of a Blue/Outstanding rating, *see* AR at 1090, 1512, and is not supported by the ensuing narrative.

[9] Curiously, the narrative in Annex L, which is supposed to be more detailed, only discusses the strength and significant weakness identified. *See* AR at 1581.

requirements and "demonstrate[d] the advanced critical thinking and analytic skills that will benefit the government." AR at 1558, 1582. An uncertainty was also based on the Task Lead, as Res Rei "did not identify which of the SORDAC task order positions the Task Lead will assume." AR at 1558; *see also* AR at 1587. The SSEB noted that plaintiff's "transition plan described a management approach to execute a realistic, organized, seamless and timely task order transition while demonstrating an effective means of interfacing with the Government," and found the proposed inspection system to be sufficient to meet requirements. AR at 1558.[10] Res Rei was assigned 19 deficiencies, relating to the information contained in four graphics. AR at 1558, 1582–87; *see also* AR at 1287, 1289–91 (Figures 3-7 through 3-10). The SSEB found that Res Rei "failed to describe and demonstrate an ability to effectively manage and execute the task order requirements" and "did not provide insight into [its] proposed approach or functional expertise," and "concluded the magnitude of the deficiencies increases the risk of unsuccessful contract performance to an unacceptable level." AR at 1558. The more detailed explanation in Annex L stated that, for each of the 19 deficiencies, "[t]he business process as depicted in [Res Rei's] proposal is a direct restatement of the government's SOW requirements and the offeror failed to provide details and insight into 'how' [its] technical approach will effectively manage and execute the" requirement in question. AR at 1582–87. As a consequence, the SSEB had no confidence in Res Rei's ability to meet each of these requirements, a material failure which "increases the risk of unsuccessful contract performance to an unacceptable level." *Id*.

Concerning the Task Order Management Plan for SOFM support, Technical Sub-factor 2b, the SSEB repeated nearly verbatim its findings under the other TOMP concerning the proposed transition plan and inspection system --- adding the modifier "sound" to its characterization of the management approach in Res Rei's transition plan. *See* AR at 1558. The SSEB found no strengths or weaknesses, and identified one uncertainty concerning the educational attainments of the proposed Task Lead. AR at 1558–59. Res Rei's proposal was assigned two deficiencies, because the "proposal failed to address how [Res Rei] would meet a significant portion of the SOFM task order requirements." AR at 1558. Mirroring the deficiencies found for the other TOMP, the SSEB explained that the first deficiency was due to Res Rei having "failed to describe and demonstrate how [it] will effectively manage and execute the" requirements and "not provid[ing] insight into [its] proposed approach or functional expertise." *Id*. The Annex L amplification noted that the proposal "fails to discuss any of the SOFM SOW requirements." AR at 1588. As was discussed above, this was due to Res Rei having inadvertently replaced the data in Figure 3-16, intended to address the SOFM requirements, with the data from Figure 3-7, addressing the SORDAC requirements. *See* AR 1287, 1301.

---

[10] These findings were also omitted from Annex L. *See* AR at 1582–87.

The other deficiency was assigned because the résumé for one of Res Rei's key employees "fail[ed] to identify past experience working with query tools such as COGNOS, TOAD, or SQL." AR at 1558. The SSEB initially decreed this failing a "significant weakness/risk," AR at 1448, and apparently downgraded Res Rei upon realizing this flaw constituted "a material failure to meet all requirements of the RFP," AR at 1588. The past experience in question was inadvertently omitted when Res Rei reduced the size of Volume I of its proposal. *See* Suppl. to the Admin. R. (ECF No. 28) at 87. As a result of a protest by another bidder, *see* AR at 2577–78, the agency subsequently determined that this deficiency was improperly assigned due to ambiguity in the requirement language. AR at 1606. Despite this correction, Res Rei's overall rating of Red did not change for Technical Sub-factor 2b, due to the other identified deficiency. *Id.*

In Volume II of its proposal, Res Rei submitted five past performance information sheets. AR at 1322–41. Two of these sheets concerned the individual experiences of proposed key personnel, AR at 1322–29, and the other three covered subcontracts performed by two of Res Rei's proposed subcontractors, AR at 1330–41. Res Rei also identified four Past Performance Questionnaires (PPQs) that would be directly e-mailed to SOCOM, concerning the work of the same two subcontractors. AR at 1342. The SSEB found that five PPQs were received --- the maximum number allowed, *see* AR at 1086 --- concerning the work of its subcontractors on four contracts. AR at 1475.[11] The SSEB did not evaluate the personal experience of the two proposed key employees. *Id.* Of the thirty-five requirements contained in the solicitation SOW, *see* AR at 700–06, the agency found that the past performance reported for the two subcontractors did not cover eighteen of them, AR at 1475–77.[12] Consequently, the agency assigned Res Rei a rating of unknown confidence for past performance. AR at 1475, 1477–78, 1496.

The SSEB initially recommended a competitive range of just one offeror, [Offeror M], identified as "Offeror M." AR at 1579–80. Res Rei was among a group of eight offerors who were deemed outside of the competitive range because their proposals contained portions requiring a "major rewrite" --- in plaintiff's case, of both Technical Sub-factors 2a and 2b. AR at 1576 (Offeror L). Of the other seven evaluated at that time, [Offeror M] was the only one with a Green/Acceptable rating for Technical Sub-factor 2, and received the highest rating of Blue/Outstanding for Technical Sub-factor 1. AR at 1578–79. Not only was [Offeror M's] proposal the

---

[11] As the SSEB explained, "[o]ne of the submitted PPQs was on a subcontractor that was not included in Volume II." AR at 1475. The record actually contains two PPQs for two entities not identified in the proposal. *See* AR at 1347–61.

[12] The work of the subcontractors was apparently found to be recent and relevant in other respects. *See* AR at 1478, 1496.

most highly-rated technically, it offered the lowest price of this group --- and was found to be [XXXXXXX] less expensive than the other two proposals receiving a Blue/Outstanding rating for Technical Sub-factor 1. AR at 1579, 1596. The SSEB determined that the other six offerors whose proposals did not require a major rewrite would have to overcome too great a gap in technical ratings and price to have a reasonable chance at an award, and initially excluded them from the competitive range. AR at 1578–79, 1595–96.

Within two months, after the corrective action was taken in response to Offeror F's GAO protest (concerning Technical Sub-factor 2b's required experience using "query tools"), the competitive range was expanded by four offerors. AR at 2577–82. From the excluded group whose proposals were found not to require a major rewrite, the four lowest priced proposals (including the two highest-rated technically) were added to the competitive range. AR at 2580–81. Three months later, after the Court ordered that FAST's proposal be evaluated, the agency revisited the competitive range a second time. *See* AR at 1597–1608. The Contracting Officer determined that [Offeror P] --- with the [XXXXXXXX] price, a Purple/Good rating under Technical Sub-factor 1, TOMP proposals that were unacceptable but with "deficiencies . . . correctable through discussions," and a "substantial confidence" rating for past performance --- should be included in the competitive range. AR at 1603 (Offeror P).

The SSEB Chair and the Contracting Officer then reviewed the evaluations for the previously-excluded offerors and determined that two additional offerors should also be included in the competitive range: Offeror N, with a rating of Blue/Outstanding for Technical Sub-factor 1, the lowest price, and Technical Sub-factor 2 proposals that were unacceptable but had correctable deficiencies; and Offeror C, with correctable deficiencies and a lower price than another offeror already in the range. AR at 1603–04. The other eight, including Res Rei, remained excluded because of "other offerors with a lower [Most Probable Cost (MPC)] that are rated technically the same or higher," which meant they did "not have a reasonable chance of being selected for award." AR at 1604. Although the agency found that discussions with Res Rei "could lead to a technically acceptable proposal," it noted that Res Rei's price was [XXX] higher than that of [Offeror M] and [XXX] higher than the lowest-priced proposal, and that all offerors in the competitive range were "rated technically higher" and "have a lower MPC" than Res Rei. AR at 1606.[13]

---

[13]   Although the analysis and the table in this addendum to the SSEB evaluation report make it clear that the competitive range was expanded by three offerors, one phrase inexplicably states that the removal of two offerors already in the range was recommended, and the concurrences of the Advisory Council Chair and Source Selection Authority only reference two of the three being added. AR at 1607–08.

## D. Res Rei's Protests

After Res Rei was informed of the basis for its exclusion from the competitive range in a debriefing document --- through which it came to realize its errors in omitting the search tool experience from Maureen Domenech's résumé and replacing SOFM information with SORDAC information in Figure 3-16, *see* AR at 2011 --- it filed a bid protest with the GAO, *see* AR at 2232–2384.  This protest was dismissed due to FAST having filed its protest in our court concerning the same solicitation.  AR at 2973–74.  After FAST's protest was resolved, Res Rei re-filed its protest before the GAO, and the GAO ultimately denied it on the merits.  AR at 3309–18.  Res Rei then brought its bid protest in our court.[14]

In its initial GAO protest, Res Rei objected to the agency's inability to receive proposals at the e-mail address specified in the solicitation and its failure to seek clarification regarding what Res Rei characterized as two clerical mistakes which resulted --- namely the information omitted from the résumé and the information repeated in the chart.  AR at 2236, 2240–44.  Second, Res Rei argued the agency evaluated the proposal in a manner inconsistent with the terms of the solicitation.  AR at 2236–37, 2244–60.  Third, Res Rei contended that the agency improperly released the government's independent cost estimate (IGCE) to the offerors who were eliminated from the competitive range, in violation of the Procurement Integrity Act (PIA), 41 U.S.C. § 2102(a)(1).  AR at 2237, 2260–61.  Fourth, Res Rei claimed that the government applied its own cost estimate to adjust offerors' costs in a way that did not take account of their unique methods of performance.  AR at 2237, 2261–62.  Finally, Res Rei argued that the numerous errors in the procurement prevented the offerors from being evaluated fairly and consequently required that the solicitation be canceled and re-issued.  AR at 2237, 2263.  The government moved to dismiss the challenge to the procedures for receiving proposals as untimely, and the PIA claim on the ground that Res Rei's MPC was unrelated to the IGCE.  AR at 2252–56.  The GAO granted the partial dismissal request, AR at 2393, and Res Rei moved for reconsideration, AR at 2569–72.

Res Rei then filed a supplemental protest, raising three additional grounds.  AR at 2975–3024.  First, it alleged that the e-mail submission difficulties previously discussed were compounded by GAO's acceptance of another offeror's proposal at an e-mail address different from the one listed in the solicitation.  AR at 2979, 2983–84.  Second, Res Rei contended that there had been improper communications

---

[14]  Two offerors which had advanced to the competitive range, St. Michael's Inc. and FAST, intervened in this case.  Order (Nov. 4, 2015).  Neither intervenor filed a merits brief, but FAST's counsel did appear at the hearing on the motions for judgment on the administrative record.

between a member of the contracting office staff and [Mr. Y], the task lead on a contract supporting SOCOM's J8-S Division, allowing Mr. [Y] to arrange for J8-S support staff to enter into exclusive employment agreements with another prospective offeror.[15]  AR at 2980, 2984–85.  Third, Res Rei asserted the agency had evaluated its Task Order Management Plan, Technical Sub-factor 2, in a manner that was inconsistent with the terms of the solicitation.  AR at 2980, 2985–88.

On April 8, 2015, the GAO dismissed Res Rei's protest and pending request for reconsideration, because this court's decision in FAST's protest could make any decision by the GAO "academic."  AR at 2973–74.  After learning of the Court's oral decision in the FAST protest, on July 10, 2015, Res Rei re-filed its protest and supplemental protest.  AR at 3193–94.

On October 16, 2015, the GAO denied Res Rei's protest.  The GAO found that Res Rei had not timely challenged SOCOM's inability to receive properly-sized proposals, as this problem was known prior to the deadline for submitting proposals and thus should have been raised prior to that deadline.  AR at 3313–14 (citing 4 C.F.R. § 21.2(a)(1)).  The GAO also stated that since Res Rei was responsible for the errors in its proposal that were made during its efforts to reformat the proposal, there was no basis for relieving Res Rei from the consequences of its own errors.  AR at 3314.

Next, the GAO found all of Res Rei's challenges to the evaluation of its proposal to be without merit because, in the GAO's view, those evaluations complied with the terms of the solicitation and were sound exercises of the agency's discretion.  AR at 3315–18.  Regarding the SORDAC task order, the GAO found the agency's evaluation reasonable, as Res Rei's proposal "consist[ed] largely of a generic management approach and a restatement of the SORDAC SOW requirements."  AR at 3316.  The GAO reiterated that Res Rei was responsible for erroneously replacing the information addressing the SOFM task order requirements with information concerning the SORDAC requirements.  AR at 3317.  And it rejected Res Rei's contention that because the knowledge and experience of one of its proposed key personnel was known to the agency, that information could be omitted from the proposal.  AR at 3317–18.  Finally, the GAO found that the information Res Rei inadvertently omitted from its proposal constituted material omissions, not minor or clerical errors which could be the subject of clarifications.  AR at 3318 (citing, *inter alia*, 48 C.F.R. § 15.306(a)).

Res Rei then brought its protest to our court.  The allegations in its complaint fall into six areas.  First, Res Rei complains that the initial version of Volume I of its proposal was not accepted by SOCOM despite being below the size limit ---

---

[15]  The J8-S task order was deleted from the solicitation by an amendment issued by the agency on September 4, 2014.  AR at 939.

requiring it to drastically alter its proposal --- although the agency accepted another offeror's proposal that was submitted by a means different from that required by the solicitation.  Compl. ¶¶ 13–24.[16]  Second, Res Rei alleges instances of improper conduct and preferential treatment for other offerors --- specifically, SOCOM providing advance knowledge of requirements to allow the J8-S personnel to be locked up in exclusive agreements, *id.* ¶¶ 25–29; disclosing the IGCE in violation of the PIA, 41 U.S.C. § 2102(a)(1), Compl. ¶¶ 30–32; and attempting to intimidate Res Rei by referring for criminal investigation plaintiff's use of public documents from FAST's protest, Compl. ¶¶ 33–38.[17]

Third, plaintiff alleges errors in the evaluation of its Technical submission. These include inconsistencies in the rating assigned for Sub-factor 1, and in the analysis of key personnel, *id.* ¶¶ 40–53; the manner in which the SORDAC and SOFM task order requirements were interpreted, *id.* ¶¶ 54–60; and the treatment of the SOFM task order positions that were omitted from the proposal, *id.* ¶¶ 61–65. Next, Res Rei claims that SOCOM improperly failed to seek clarification of the clerical errors in its proposal that were the result of the agency's inability to receive properly submitted proposal volumes.  *Id.* ¶¶ 66–80.  Fifth, Res Rei challenges the agency's refusal to consider the past performance information for its key employees, despite the direction of 48 C.F.R. § 15.305(a)(2)(iii).  Compl. ¶¶ 81–88.  And finally, plaintiff alleges that its proposed costs were incorrectly adjusted.  *Id.* ¶¶ 89–94.

Res Rei maintains that the actions alleged in its complaint were taken arbitrarily and capriciously, and improperly gave preferential treatment to its competitors, in violation of the FAR's guiding principles, 48 C.F.R. § 1.102, *see* Compl. ¶¶ 95–99; contrary to the FAR provisions concerning proposal submission, 48 C.F.R. §§ 15.208, 52.215-1(c)(3)(ii)(A)(2), *see* Compl. ¶¶ 100–04, 121–27; in violation of the Competition in Contracting Act, 10 U.S.C. § 2304, *see* Compl. ¶¶ 105–09; and contrary to the terms of the solicitation and the Administrative Procedure Act standard applicable in bid protests, Compl. ¶¶ 110–15, 128–31; *see* 28 U.S.C. § 1491(b)(4) (incorporating 5 U.S.C. § 706).[18]  The requested relief includes

---

[16]  The complaint references are to the version filed as ECF No. 12.

[17]  The claims regarding the J8-S personnel and the criminal referral have dropped out of this case, as they were not raised in Res Rei's briefs relating to the motions for judgment on the administrative record.  *See Commissioning Sols. Glob., LLC v. United States*, 97 Fed. Cl. 1, 2–3 n.2 (2011).

[18]  The complaint also seemingly invokes the implied contract to fairly and honestly consider bids.  *See* Compl. ¶¶ 116–20.  This is, at best, redundant, as any claim which could have been brought under that theory is preserved within our jurisdiction under 28 U.S.C. § 1491(b)(1).  *See Kellogg Brown & Root Servs. v. United States*, 117 Fed. Cl. 764, 771–72 (2014) (citing *Resource Conservation Grp.,*

an injunction preventing SOCOM from proceeding with the procurement until the solicitation is amended and reissued for new proposals.  *See* Compl. ¶¶ 3, 140, 143.[19]

Plaintiff and defendant have each filed motions for judgment on the administrative record, and a hearing on the motions was held.  After a careful consideration of the administrative record, the papers submitted and the arguments of counsel, this opinion follows.

## II.  DISCUSSION

### A.  Legal Standards

The ADRA amendments to the Tucker Act require our court to follow Administrative Procedure Act (APA) standards of review in bid protests.  28 U.S.C. § 1491(b)(4).  Those standards, incorporated by reference, provide that a:

> reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be -- [¶] (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [¶] (B) contrary to constitutional right, power, privilege, or immunity; [¶] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [¶] (D) without observance of procedure required by law; [¶] (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or [¶] (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.  In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706 (2006).

Based on an apparent misreading of the legislative history, *see Gulf Grp., Inc. v. United States*, 61 Fed. Cl. 338, 350 n.25 (2004), the Supreme Court had determined, before the 1996 enactment of the ADRA, that the *de novo* review standard of 5 U.S.C. §706(2)(F) does not usually apply in review of informal agency decisions --- decisions, that is, such as procurement awards.  *See Citizens to Pres.*

---

*LLC v. United States*, 597 F.3d 1238 (Fed. Cir. 2010); *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 522–25 (2011)).

[19]  During oral argument, counsel for Res Rei represented that injunctive relief that maintained the procurement but required a proper reevaluation of its proposal would be acceptable.

*Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) (*Overton Park*).  Instead, courts in those cases are supposed to apply the standard of 5 U.S.C. §706(2)(A): whether the agency's acts were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *See Overton Park*, 401 U.S. at 416 (citation omitted); *see also Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (applying 5 U.S.C. §706(2)(A)).  *But see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001) (*Domenico Garufi*) (also citing 5 U.S.C. §706(2)(D) as applicable in bid protests).  The "focal point for judicial review" is usually "the administrative record already in existence," *Camp v. Pitts*, 411 U.S. 138, 142 (1973), even when the matter under review was not the product of a formal hearing.  *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009).

A motion for judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC) differs from motions for summary judgment under RCFC 56, as the existence of genuine issues of material fact does not preclude judgment on the administrative record.  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1355–57 (Fed. Cir. 2005); *Fort Carson Supp. Servs. v. United States*, 71 Fed. Cl. 571, 585 (2006).  Rather, a motion for judgment on the administrative record examines whether the administrative body, given all the disputed and undisputed facts appearing in the record, acted in a manner that complied with the legal standards governing the decision under review.  *See Fort Carson*, 71 Fed. Cl. at 585; *Greene v. United States*, 65 Fed. Cl. 375, 382 (2005); *Arch Chems., Inc. v. United States*, 64 Fed. Cl. 380, 388 (2005).  Factual findings are based on the evidence in the record, "as if [the court] were conducting a trial on the record."  *Bannum*, 404 F.3d at 1357; *see also Carahsoft Tech. Corp. v. United States*, 86 Fed. Cl. 325, 337 (2009); *Gulf Grp.*, 61 Fed. Cl. at 350.

Under the "arbitrary and capricious" standard, the court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment" by the agency.  *Overton Park*, 401 U.S. at 416.  Although "searching and careful, the ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency."  *Id.*  The court will instead look to see if an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and "may not supply a reasoned basis for the agency's action that the agency itself has not given," *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974).  The court must determine whether "the procurement official's decision lacked a rational basis."  *Domenico Garufi*, 238 F.3d at 1332 (adopting APA standards developed by the D.C. Circuit); *see also Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 204 (D.C. Cir. 1984).  A second ground for setting aside a procurement decision is when the protester can show that "the procurement procedure involved a violation of

regulation or procedure." *Domenico Garufi*, 238 F.3d at 1332.  This showing must be of a "clear and prejudicial violation of applicable statutes or regulations."  *Id.* at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

Under the first rational basis ground, the applicable test is "whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Domenico Garufi*, 238 F.3d at 1333 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).  This entails determining whether the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,'" or made a decision that was "'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

Because of the deference courts give to discretionary procurement decisions, "the 'disappointed bidder bears a heavy burden of showing that the [procurement] decision had no rational basis.'" *Domenico Garufi*, 238 F.3d at 1333 (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)).  The protester must demonstrate, by a preponderance of the evidence, the absence of any rational basis for the agency decision.  *See Overstreet Elec. Co. v. United States*, 59 Fed. Cl. 99, 117 (2003); *Info. Tech. & Appl'ns Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001) (citing *GraphicData, LLC v. United States*, 37 Fed. Cl. 771, 779 (1997)), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003).  If arbitrary action is found as a matter of law, the Court will then decide the factual question of whether the action was prejudicial to the bid protester.  *See Bannum*, 404 F.3d at 1351–54.

The interpretation of a solicitation, as that of contract provisions generally, is a question of law which courts review *de novo*.  *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (2004); *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1353 (2004).  Whether a provision in a solicitation is ambiguous, and whether an ambiguity is latent or patent, are also questions of law over which courts exercise independent review on a case-by-case basis.  *NVT Techs.*, 370 F.3d at 1159; *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (1996).  When interpreting a solicitation, the document must be considered as a whole and interpreted in "a manner that harmonizes and gives reasonable meaning to all of its provisions." *Banknote Corp.*, 365 F.3d at 1353; *NVT Techs.*, 370 F.3d at 1159.  If the provisions are clear and unambiguous, the Court must give them "their plain and ordinary meaning." *Banknote Corp.*, 365 F.3d at 1353.

## B.  Analysis

Plaintiff argues that it was harmed by SOCOM's inability to receive the initial submission of Volume I of its proposal, and the agency's failure to seek

clarification of the errors contained in the modified version of the volume; by SOCOM's alleged errors in evaluating Technical Sub-factor 1, and in interpreting and applying the requirements of Technical Sub-factor 2; and by the agency's refusal to consider the past performances of its individual employees.  *See* Pl.'s Mem. in Supp. of Mot. for J. on the Admin. R. (Pl.'s Br.) at 17–21, 22–39.  Before addressing these areas of the protest, however, the Court will briefly discuss actions that Res Rei *does not* contend harmed it.

In support of its request that the solicitation be amended and reissued, plaintiff cites a laundry list of errors that have been found to the detriment of others, and speculates as to the prospect of further such injury.  *See id.* at 15–17, 21, 41–42; Pl.'s Mem. in Opp'n to Def.'s Mot. for J. on the Admin. R. (Pl.'s Reply) at 5–6, 27–28.  This includes the fact, established in FAST's protest, *FAST*, 124 Fed. Cl. at 698, that at least seven offerors experienced difficulties in having their e-mailed proposals received at the SWMS address, five because of size issues; the corrective action taken in response to two other protests, and the eventual expansion of the competitive range from one to eight; and concerns that remedying the allegedly erroneous interpretation of the solicitation used by SOCOM to evaluate Res Rei's proposal would give rise to claims by other offerors similarly disadvantaged.

That the agency's server, contrary to what offerors were told in the solicitation, AR at 1083, could not accept e-mails with attached files totaling less than 20 megabytes is beyond question at this point.  *See FAST*, 124 Fed. Cl. at 705.  But the other two offerors affected by proposal receipt problems, FAST and [Offeror O], ultimately had their proposals accepted under the Government Control exception, *id.* at 705, 707–08, so the server issue is no obstacle to the procurement's continuation.  Nor can the Court see how errors that have been addressed by corrective action somehow show that corrective action cannot be expected to remedy other alleged errors.

Any harm allegedly suffered by other offerors who are not parties to this action has no bearing on the merits of plaintiff's protest.  A bid-protest is not some chivalric exercise whereby an offeror for a government contract can vindicate the interests of other bidders, or the public at large.  While it has been recognized that the public interest is furthered by such protests, *see Scanwell Labs., Inc. v. Shaffer*, 424 F.2d 859, 864 (D.C. Cir. 1970), the outcome turns on injury suffered by the protester.  Under the APA, these cases rest on "interested party" status, 28 U.S.C. § 1491(b), and in pre-award challenges to exclusions from a competitive range, success requires a showing that procurement errors cost *the protester* a substantial chance at having made the cut, *see Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013).  Errors in the consideration of other offerors' proposals are irrelevant unless they affected the protester's opportunity to receive the award.  *See United States v. IBM Corp.*, 892 F.2d 1006, 1010–11 (Fed. Cir. 1989).

Although Res Rei does not cite any authority for the proposition, the Court recognizes that when an erroneous interpretation of a solicitation has been found to a protester's prejudice, the fact that this interpretation infected all evaluations could be taken into consideration in the fashioning of an injunctive remedy. Similar problems with solicitation terms have led to the ordering of solicitation cancellations, amendments, or re-issuances. *See, e.g., FirstLine Transp. Sec., Inc. v. United States*, 100 Fed. Cl. 359, 401–03 (2011); *Rotech Healthcare Inc. v. United States*, 71 Fed. Cl. 393, 431 (2006); *Charles H. Tompkins Co. v. United States*, 43 Fed. Cl. 716, 723 (1999). Thus, such considerations should be restricted to the question of the proper remedy, if reaching that question proves necessary.

Two other issues raised by Res Rei have no connection to its alleged injuries. Plaintiff contends that when the agency, in debriefings, provided each offeror excluded from the competitive range with the Most Probable Cost determined for its proposal, the Independent Government Cost Estimate was necessarily disclosed, in violation of the PIA. Pl.'s Br. at 36–37 (citing 48 C.F.R. § 3.104; 41 U.S.C. § 2102(a)(1)). This obviously has nothing to do with the exclusion of Res Rei from the competitive range, and the only detriment identified by plaintiff is the possibility that an excluded offeror could share the information with an offeror still in contention for award. *Id.* at 37. In any event, after the government persuasively explained that the MPC is based on the specific proposal of an offeror, and not on the IGCE, Def.'s Resp. to Pl.'s Mot. for J. (Def.'s Reply) at 7–8, the issue was not raised by Res Rei at the hearing and will not be considered further.

Res Rei also discusses an alleged error in the adjustment of its costs. Pl.'s Br. at 39–40; Pl.'s Reply at 20–22. The purported error is mentioned for its own sake, as evidence of the agency's inability to properly conduct the procurement, and not for any impact on the competitive range determination. Plaintiff expressly "does not dispute the adjustment of the costs because of the increase of Res Rei's proposal cost, which did not raise significantly if compared to the total amount of the contract." Pl.'s Br. at 39; Pl.'s Reply at 21. The issue is thus irrelevant to the merits of this protest. The Court will now turn to the four areas of Res Rei's protest that do involve allegations of prejudice to the plaintiff.

### *1. The Failure to Accept and Evaluate Res Rei's Initial Submission*

Plaintiff argues that SOCOM improperly refused to treat its initial attempts at e-mailing Volume I of its proposal as having been successful. Pl.'s Br. at 15–21. The agency instead evaluated the modified version, in which Res Rei inadvertently omitted information from the résumé of a key employee and substituted information concerning one task order in place of that for another. Res Rei contends that SOCOM was biased against it and gave it unequal treatment, by applying the Government Control exception to deem [Offeror O's] proposal timely received but

not accepting for evaluation its unmodified version of Volume I. *Id.* at 4, 19–21.[20]
The proposal of [Offeror O] was received only at a different SOCOM e-mail address
from the one offerors were required to use. *See* AR at 3304–05; *FAST*, 124 Fed. Cl.
at 699, 707 (described as Offeror O's proposal). Plaintiff suggests that its
unmodified proposal "may have been accepted in this alter[n]ative mailbox." Pl.'s
Br. at 17.

The administrative record does not support the contention that Res Rei's
original version of Volume I could have been received at the address used by
[Offeror O]. That address was also at socom.mil, *see* Attach. 2 to Order (Nov. 17,
2015), ECF No. 29-2, at 3 (¶1.a of CO's Answers to Written Dep. Questions), and
therefore uses the SOCOM server. There is no reason to believe that, had Res Rei
used that address, an e-mail that the server found too large to accept when
addressed to the SWMS mailbox could be accepted for delivery to another mailbox.[21]

Nor can the Court see how the Government Control exception, which the
solicitation incorporated by reference, AR at 1080, can be used to help Res Rei.
That exception treats a proposal as timely when it was "received at the Government
installation designated for receipt of offers and was under the Government's control
prior to the time set for receipt of offers." 48 C.F.R. § 52.215-1(c)(3)(ii)(A)(2); *see also*
48 C.F.R. § 15.208(b)(1)(ii). But plaintiff's problem was not the failure to have a
proposal received by SOCOM in time, as its modified version of Volume I was
indisputably accepted and evaluated. Rather, plaintiff wants the version it
attempted to submit earlier to be the one evaluated. Even if the Government
Control exception could be construed as requiring the agency to treat the
unmodified version as having been timely received, it would have been proper for
SOCOM to instead evaluate a later but timely-received modification, which offerors
have the right to submit. *See* 48 C.F.R. § 52.215-1(a), (c)(6). Thus, plaintiff's
argument comes down instead to the claim that the government was responsible for
the inadvertent substantive modification of its proposal, because its original,
properly-sized version was not accepted by the SOCOM server for evaluation.

---

[20] During the hearing on the motions for judgment, Res Rei also maintained that it
was treated unequally because the agency applied the Government Control
exception to accept FAST's proposal. But the agency chose not to apply the
exception to FAST's proposal, and only did so under an order of this Court. *See*
*FAST*, 124 Fed. Cl. at 708.

[21] It is unclear why [Offeror O's] proposal never made it to the SWMS address, but
size does not appear to have been an issue --- the e-mail contained only 9.3
megabytes of data when received, FAST AR at 890, and a submission that was fifty
percent larger arrived at the SWMS address, *see* FAST AR at 726.

The government argues that Res Rei's protest on this ground is untimely because plaintiff was aware of the agency's e-mail receipt problems before the deadline for proposal submission, but did not file a protest prior to that deadline. Def.'s Mot. for J. on the Admin. R. (Def.'s Mot) at 20–23 (citing 4 C.F.R. § 21.2(a)(l)). The GAO found this protest ground untimely, AR at 3314, applying its bid protest regulation concerning "[p]rotests based upon improprieties in a solicitation which are apparent prior to . . . the time set for receipt of initial proposals," 4 C.F.R. § 21.2(a)(1). Regardless of how the GAO interprets this provision for its purposes, the regulation plainly concerns errors in the solicitation itself, not in the procurement process generally, and the Federal Circuit so understood the regulation when it was cited as support for a rule crafted for protesters "object[ing] to *the terms* of a government solicitation containing a patent error." *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1314–15 (Fed. Cir. 2007) (emphasis added). This aspect of Res Rei's protest does not challenge the terms of the solicitation, but rather the agency's failure to follow the term concerning proposal submissions.

Moreover, the strategic behavior addressed by the waiver rule adopted in *Blue & Gold* --- that an offeror aware of an illegal term in a solicitation might wait to see if it is awarded the contract and, if not, then spring a protest rendering the proposal writing and evaluation processes a waste of time and money, *see id.* at 1314 --- is hardly implicated by Res Rei's circumstance. There is little reason to expect that an offeror, aware that it mistakenly omitted from its proposal text addressing solicitation requirements, would wait to try and build a protest around the mistakes, rather than correcting them in a proposal modification. *See* 48 C.F.R. § 52.215-1(a), (c)(6); Pl.'s Reply at 7. While the Court acknowledges that an offeror should be responsible for identifying and raising any such mistakes within a reasonable amount of time, the rule urged by the government does not rest on such a basis. The Court will not consider this protest ground waived.

Res Rei maintains that, had the agency's server been able to accept e-mails with files totaling up to 20 megabytes, as offerors were advised, *see* AR at 1083, its initial version of Volume I, without the errors, would have been accepted and evaluated. This much is undoubtedly true. It does not follow, however, that the flaw in SOCOM's server is the proximate cause of the errors in Res Rei's modified proposal. To the contrary, when informed of the submission problem, the CO advised Res Rei to "[p]lease try submitting the document in multiple emails." AR at 1215. But Res Rei's CEO refused to follow the simple expedient of breaking the Volume I PDF file into more than one file, due to an inexplicable concern that the use of more than one file "will drastically alter the presentation." AR at 1211. Because of this strongly expressed concern, the CO agreed that Res Rei should "try reducing the size first." AR at 1209. But the idea of reducing the size of the file, and the manner in which it was done, were Res Rei's alone, and were neither

dictated by nor shared with SOCOM.  The Court cannot find that the agency is responsible for those errors.

  As noted above, the errors introduced into Res Rei's proposal during its resizing of the file were twofold.  First, plaintiff deleted the "Working Knowledge" section from the end of Ms. Domenech's résumé, which listed knowledge of the query tools Discoverer, COGNOS, TOAD, and SQL.  *Compare* Suppl. to the Admin. R. (ECF No. 28) at 87 *with* AR at 1307.  Second, plaintiff duplicated Figure 3-7, a graphic containing SORDAC task order information, in a graphic labeled Figure 3-16, which should have discussed the requirements for the SOFM task order.  *Compare* AR 1287, 1301 *with* Suppl. to Admin. R. (ECF No. 28) at 81.  In the complaint, Res Rei described these as "clerical errors" concerning which the agency should have sought clarification, Compl. ¶¶ 66–75, but did not address this argument in its briefs.  Nevertheless, the point was raised during the hearing, in which Res Rei cited the duty to inquire about clerical errors that was recognized in *Griffy's Landscape Maintenance LLC v. United States*, 46 Fed. Cl. 257 (2000).

  Although this issue was probably waived by its absence from both of plaintiff's briefs, *see Commissioning Sols. Glob., LLC v. United States*, 97 Fed. Cl. 1, 2–3 n.2 (2011), plaintiff must do more than cite a case recognizing a duty to clarify clerical errors if it is to demonstrate that its errors fall in such a category.  With respect to Ms. Domenech's résumé issue, there is nothing in the modified proposal suggesting that any information was omitted.  The table of contents included with the proposal does not have an entry for the omitted "Working Knowledge" section of Ms. Domenech's résumé, although it contains entries for the other sections.[22]  AR at 1226, 1307.  And even if Ms. Domenech's relevant knowledge was gained while an employee at SOCOM, offerors were clearly informed that evaluations would be based on the proposal information and that they should assume that the agency had no prior knowledge of their experience.  AR at 1082.  *Cf. BCPeabody Constr. Servs., Inc. v. United States*, 112 Fed. Cl. 502, 512 (2013) (finding duty to seek clarifications violated when agency reviewed the missing information concerning a proposed subcontractor's experience in the proposal of another offeror).  The matter of the repeated table in some sense is a closer question, as a half-dozen references to SORDAC in a graphic that was contained in the SOFM section of the proposal should have suggested something was awry.  *See* AR at 1301.  But that something could have been Res Rei's failure to understand the SOFM requirements, and the incorrect information that was copied into the table was from the first of four tables containing SORDAC information, initially appearing fourteen pages earlier in the proposal, AR at 1287.  The error was thus not nearly as obvious as, say, placing two

---

[22]  The original version of Res Rei's Volume I, which contained the "Working Knowledge" section of Ms. Domenech's résumé, included in its table of contents a reference to all sections of her résumé except that one.  *See* Suppl. to Admin. R. (ECF No. 28) at 4.

identical information sheets back-to-back in a proposal.  *Cf. BCPeabody*, 112 Fed. Cl. at 505 (information sheets followed by identical copies).  The Court is not persuaded that any duty to seek clarification of clerical errors was violated.

In any event, even if the agency should have evaluated the unmodified version of Res Rei's proposal, and even if it should have sought clarification of the two errors in the proposal, this would not have made a difference in Res Rei's evaluation.  The issue concerning Ms. Domenech's résumé became moot as a result of corrective action in response to another offeror's bid protest, and thus the lack of identified knowledge of certain query tools was no longer considered a deficiency in Res Rei's proposal.  AR at 1606.[23]  And the information omitted from Figure 3-16 was copied nearly verbatim from the requirements of the SOFM Statement of Work. *See* Suppl. to Admin. R. (ECF No. 28) at 81; AR at 1145–49 (paragraphs 4.0.1.1–.3, 4.0.2.1–.2, 4.0.2.4–.5, 4.0.2.8–.9, 4.0.3.2–.3, 4.0.3.5–.7, 4.0.3.10).  As we shall see next, such mere restatements of the requirements would still add up to a failure to address how the requirements would be met.

### *2.  The Agency Properly Followed the Solicitation's Evaluation Criteria for Technical Sub-Factor 2a*

Res Rei argues that the agency misinterpreted the solicitation's evaluation criteria for Technical Sub-Factor 2a, the SORDAC Task Order Management Plan. Pl.'s Br. at 22–30.  Under this sub-factor, SOCOM assigned 19 deficiencies because Res Rei "failed to provide details and insight into 'how' [its] technical approach will effectively manage and execute" the requirements for 19 of the 20 functions identified in the SOW.  AR at 1582–87.[24]  The agency found instead that plaintiff's "business process as depicted in [its] proposal is a direct restatement of the government's SOW requirements," *id*., and thus Res Rei "failed to describe and demonstrate an ability to effectively manage and execute the task order requirements" and to "provide insight into [its] proposed approach or functional expertise," AR at 1558.

Res Rei rests its challenge to the agency's interpretation of the solicitation criteria on SOCOM's use of the term "business process" to describe what was proposed by plaintiff under this sub-factor.  Pl.'s Br. at 24–30.  Since this term does

---

[23]  This was actually more favorable treatment than the corrective action warranted, as a working knowledge of COGNOS or its equivalent would still have been required.  *See* AR at 2577–78.

[24]  It is not clear why the same deficiency was not found for the twentieth function, "Tri-Annual Review – Accounting and Finance Support," as Res Rei similarly copied nearly verbatim the requirements of that function of subtask 1.  *See* AR at 1120 (¶¶ 3.1.4.1–.5); AR at 1287 (fourth column of Figure 3-7).

not appear in the solicitation, Res Rei argues that the agency based this aspect of the evaluation on something other than what the solicitation required. Under plaintiff's interpretation of the solicitation, all that it needed to do was state "how its Task Order Lead would articulate management and execution of the requirements." *Id.* at 25. By this, plaintiff apparently means that it was sufficient to state that each of the four subtasks identified in the SOW will be managed by a subtask team lead, who reports to (or in one case is) Mr. Gossage, the Task Order Lead; and then to provide four tables, each exclusively composed of near verbatim quotes from the requirements for each subtask, stating the work for which each subtask team lead is responsible. *See* AR at 1286–91. The responsibilities of a subtask team lead --- such matters as "handling the day-to-day management and administration of project tasks," "develop[ing] detailed work plans and schedules," and "assigning staff responsibilities and directly supervis[ing] all staff efforts" --- were themselves copied nearly verbatim from the SOW. *See* AR at 1118, 1286.[25] According to plaintiff, nothing resembling a "process" or "plan" is required, just a statement that the individuals holding particular positions will see that the work is done.

Plaintiff also identifies SOCOM's solitary reference to a "personnel plan" in the agency report to the GAO, *see* AR at 2593, as further proof that SOCOM misinterpreted the solicitation, *see* Pl.'s Br. at 24–28. Res Rei maintains that this term, which was not employed in any of the evaluation documents, has some specialized meaning --- apparently, a table listing positions and salaries. Pl.'s Br. at 27–28. Where this notion comes from, plaintiff does not say, but in any event none of the evaluation documents so much as suggest that such a plan was required. Rather than invoking a term of art, in the report to the GAO the agency was merely referring to the personnel element of the Task Order Management Plan Sub-factor, immediately before quoting accurately and in full the evaluation criteria for that element. *See* AR at 2593; AR at 1090. It hardly seems improper to refer to a personnel element, in a management *plan* under which one must "demonstrate[] an ability to effectively manage and execute the requirements," AR at 1090, as involving a personnel plan.

Res Rei similarly contends that "business process" has a particular meaning, such that its evaluation "means to assess the steps to be taken in order to complete a task" or "to assess the indicated series of actions that will be taken to accomplish an assignment." Pl.'s Br. at 27; Pl.'s Reply at 12.[26] But it is clear from the

---

[25] The Court notes that, under the SOW, these responsibilities were supposed to be shouldered by the "Task Lead" for the entire task order, who was described as "an on-site *single* point of contact." AR at 1118 (emphasis added).

[26] Plaintiff cited no authority for this contention in its briefs. During the hearing, two internet sources were referenced --- one described a management plan for

discussion in Annex L that the SSEB was merely generically describing the portion of plaintiff's proposal which addressed the TOMP requirements as concerning a "business process," and was not employing a term of art with a specific meaning that should have been stated in the solicitation. *See* AR at 1582–87. The agency was not requiring that proposals include a particular type of "business process," but was instead tautologically using the term to describe what was proposed.

Putting the jargon to the side, what plaintiff really objects to is the agency's expectation that Res Rei needed to "provide details and insight into 'how' [its] technical approach will effectively manage and execute the" specific requirements of the SOW. *See id.*; Pl.'s Br. at 27. But this was hardly a misinterpretation of the terms of the solicitation. In the instructions, offerors were told that they "shall demonstrate their task order *technical approach to execute all of the requirements* in accordance with the attached" SOWs for each of the task orders. AR at 1085 (emphasis added). This included "the ability to meet the requirements without introducing unacceptable risk." *Id.* In the evaluation methodology section of the solicitation, SOCOM stated it would "evaluate the offeror's *technical approach to managing and executing* each of the task orders," and under the personnel element explained that each offeror would be evaluated based on how well the "offeror demonstrates an ability to *effectively manage and execute the requirements* outlined in the SOW, providing *appropriate insight and functional expertise*." AR at 1090 (emphases added). In light of what the offerors were asked to demonstrate, and the evaluation method promised by the agency, the solicitation clearly required that offerors do more than merely copy-and-paste some of the requirements and pledge that the person holding a particular position would make sure the lot were accomplished. To dispel any doubt on this point, the solicitation instructions stated: "The proposal should not simply rephrase or restate the Government's requirements, but shall address how the Offeror intends to meet these requirements." AR at 1082.

Res Rei argues that it did more than restate the requirements --- citing the portion of its proposal describing key personnel, in which the duties of the Task Order Lead are lifted nearly verbatim from the SOW, *see* AR at 1118, and which introduces the use of subtask team leads, AR at 1277; and the portion in which management philosophy and structure (including the task order management *process*) are generally discussed, AR at 1285. Pl.'s Br. at 28. But these passages do not discuss any of the specific requirements. Plaintiff also maintains that the solicitation language was latently ambiguous concerning the need to show how requirements would be executed. Pl.'s Br. at 28. In support of this proposition, Res Rei cites the evaluations of twelve other offerors under Sub-factor 2a, who were

---

purposes of research grant proposals submitted to a particular university, and the other was apparently a passage from a management textbook. Neither of these concern government contracting.

found not to have addressed how varying numbers of requirements would be met. *Id.* at 29–30.  But only three of the offerors were assessed with as many deficiencies as Res Rei, *see* AR at 1515, 1523, 1567, and from this the Court cannot conclude that otherwise clear solicitation language was ambiguous.  Rather than misunderstanding the need to address requirements, the experience of other offerors --- seven of which did not adequately address between one and six of the requirements, *see* AR at 1527, 1530, 1538, 1542, 1545, 1550, 1554, and three of which adequately addressed them all, *see* AR at 1534, 1562–63, 1571 --- more likely reflects the combination of a tough grading regime and the difficulties of addressing fifteen SOW pages full of requirements, *see* AR at 1119–34, in a proposal limited to fifteen pages, AR at 1083.[27]

The Court thus concludes that the agency properly interpreted and applied the TOMP evaluation methodology in its assessment of Res Rei under Sub-factor 2a.  And as discussed above, for the same reasons just explained, the Court cannot find that plaintiff's chance to be included in the competitive range would have increased had the agency evaluated Figure 3-16 from Res Rei's unmodified proposal. The original table followed the same approach in copying nearly verbatim the requirements for the SOFM task order, *see* Suppl. to Admin. R. (ECF No. 28) at 81; AR at 1145–49, and would rationally have received the same deficiency assessment from the agency.

### 3.  *The Past Performance of Individual Employees*

Plaintiff argues that SOCOM violated the FAR and the terms of the solicitation in deciding not to evaluate the past performance information submitted for two of its key personnel.  Pl.'s Br. at 37–39; Pl.'s Reply at 17–20; *see also* AR at 1475.  Res Rei quotes the solicitation's past performance evaluation methodology as stating that the "evaluation considers the offeror's demonstrated record of performance in providing services and products the same or similar to those spelled out in the SOW **as either a Prime contractor or a subcontractor**," and notes that the experience of key personnel is not excluded.  Pl.'s Br. at 38 (quoting AR at 1091) (emphasis supplied by plaintiff).  Res Rei then contends that the FAR mandates consideration of key personnel experience, by providing: "The evaluation should take into account past performance information regarding predecessor companies, key personnel who have relevant experience, or subcontractors that will perform major or critical aspects of the requirement when such information is

---

[27]  While the Court supposes that a general and widespread misunderstanding of an evaluation factor on the part of offerors could improperly elevate the importance of other factors, much like a superficial technical analysis could improperly convert a best value procurement into a lowest-price technically acceptable one, *see FirstLine Transp. Sec.,* 100 Fed. Cl. at 378–79, the record here shows nothing of this sort.

relevant to the instant acquisition." *Id.* at 39 (quoting 48 C.F.R. § 15.305(a)(2)(iii)) (emphasis omitted).

In response, defendant notes that the solicitation instructions for past performance stated: "Contract efforts will be considered either relevant or not relevant. In order to be considered relevant, the effort must have been performed by the same division or corporate business unit that is proposing to perform under this requirement." Def.'s Reply at 8 (quoting AR at 1086). The government also refers to an exchange in which an offeror questioned whether the Past Performance Questionnaire form, *see* AR at 777–80, which was "very much geared to a specific contract and not to personal past performance of an individual," could be changed "so it fits a personal reference," or should the offeror instead "submit a formal letter of reference?" AR at 813; *see* Def.'s Reply at 8. The agency responded, "[t]he Government is not looking for personal past performance of an individual." AR at 813. Defendant maintains that the agency appropriately used its discretion not to evaluate the experience of the two individuals proposed by plaintiff, as their personal experience did not reflect an effort performed by Res Rei. *See* Def.'s Reply at 8–9.

The Court cannot agree with Res Rei's argument that the FAR mandates the consideration of past performance information of key personnel. The provision states that the past performance evaluation *should* take this information into account, not that it "must" or "shall." *See* 48 C.F.R. § 15.305(a)(2)(iii). Several decisions of our court have interpreted this provision as permissive, giving an agency discretion to decide whether to consider such information. *See Plasan N. Am., Inc. v. United States*, 109 Fed. Cl. 561, 573–74 (2013); *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 718 (2010); *PlanetSpace Inc. v. United States*, 92 Fed. Cl. 520, 539–40 (2010). In this case, that discretion was exercised by the agency when it drafted the solicitation, which limited relevant performance to the efforts of a particular "division or corporate business unit," *see* AR at 1086, and employed a PPQ seeking information about a *company*, not an individual, *see* AR at 777–80.[28] If there was any doubt as to the meaning of the past performance provisions, the agency's interpretation was made plain by its answer to the question concerning personal past performance. *See* AR at 813.[29] The decision not to

---

[28] The Past Performance Information forms used by plaintiff to describe the personal experience of the two key personnel were also not intended for such use, as they request information about "work performed by this company" and such items as the business's Data Universal Numbering System number. *See* AR at 1322–23, 1326.

[29] Although not raised by the government, it appears that past performance relevance was to be based on the *references* submitting *PPQs*, and not on the PPI

consider the past performance of individuals was not contrary to the solicitation's evaluation approach, but followed it, and cannot be considered arbitrary or unlawful.[30]

### *4.  The Technical Sub-factor 1 Evaluation*

The one remaining contention of Res Rei is that the agency arbitrarily evaluated its proposal under the Program Management sub-factor.  There are two aspects to this argument.  First, plaintiff maintains that the agency misunderstood the role of Mr. Gossage and improperly assigned it a significant weakness upon that basis.  Pl.'s Br. at 31–33; Pl.'s Reply at 16.  In the evaluation report, the significant weakness was "for proposing a task lead who will be assigned a multitude of duties and responsibilities," which raised "concern whether the Task Lead can adequately manage these duties given the broad scope of these responsibilities."  AR at 1557.  In Annex L, the SSEB identified six distinct roles for the Task Lead in question, Mr. Gossage, as Res Rei's proposal is said to have identified him "as the Deputy Program Manager, SORDAC Task Lead, SOFM Task Lead manager"; as having quality control and OCI responsibilities; and as "serving as the task lead for sub-task 4, Admin."  AR at 1581.[31]  Res Rei disputes the third of these listed roles, which it takes to mean Mr. Gossage was proposed as the SOFM Task Lead --- the position that was to be filled by Ms. Domenech, *see* AR at 1292, 1306.  Pl.'s Br. at 31–32.

On this point, the error is Res Rei's.  The agency stated that Mr. Gossage was proposed as the SOFM Task Lead *manager*, not the SOFM Task Lead.  AR at 1581.  In other words, he was to be the one managing the SOFM Task Lead.  Res Rei's proposal states that "Task Order Leads report directly to the IDIQ Deputy Program Manager, Mr. Charles 'Goose' Gossage," AR at 1236; that Ms. Domenech as SOFM Task Order Lead would be "[r]eporting to the Res Rei DPM," AR at 1292; and that the SOFM "Task Order Lead reports directly to the IDIQ Deputy Program Manager; the IDIQ DPM is Mr. Gossage," AR at 1300.  This relationship is clearly what the agency was describing.  The SOCOM memorandum containing the

---

sheets.  *See* AR at 1086 (stating "[r]elevancy will be determined based on contract references").  Res Rei's key personnel were the subject of the latter, not the former.

[30]  The Court also notes that the plaintiff's challenge to the decision not to consider personal past performance of individuals is a challenge to the terms of the solicitation, and should have been brought prior to the deadline for submitting proposals.  *See Blue & Gold*, 492 F.3d at 1315.

[31]  The document also mentions that Mr. Gossage was to be the person who "manages three SORDAC sub-task leaders," which is part of his role as SORDAC Task lead.  AR at 1581.

answers to the questions Res Rei posed after the pre-award debriefing states that
Mr. Gossage "manages the SOFM Task Lead," AR at 1980, demonstrating
conclusively that his role was not misunderstood.

Res Rei also argues that the agency arbitrarily downgraded its rating under
this sub-factor from Green to Yellow. Pl.'s Br. at 33–34. To be sure, the record of
SOCOM's assessment of the Program Management portion of plaintiff's proposal is,
at best, riddled with errors. The SSEB's initial evaluation assigned Res Rei the
color (Green) and description corresponding with an Acceptable rating, but rated
this part of the proposal as Good. AR at 1440. The evaluation was based on the
concern about the range of duties to be shouldered by Mr. Gossage, which was
identified as a weakness but described using language meeting the definition of a
"significant weakness." AR at 1441; *see* 48 C.F.R. § 15.001. In the final report that
was sent to the SSA, the rating was changed to Marginal, accompanied by the
appropriate color (Yellow) and description, and was based on the concern over Mr.
Gossage's duties being classified as a significant weakness. AR at 1556–57. But the
accompanying, detailed analysis in Annex L, while employing a color and rating
that matched (Yellow and Marginal), included the description corresponding with
an Outstanding rating. AR at 1581. This error was compounded when SOCOM
based the written debrief sent to Res Rei on the Annex L document, describing the
approach as "exceptional," inconsistent with the Yellow/Marginal rating. AR at
2005. When asked about this discrepancy in a follow-up conversation, the agency
informed plaintiff that the definition employed in the debrief document was a
"clerical error." AR at 1984–85.

With several errors and inconsistencies identified in the evaluation of this
sub-factor, Res Rei's skepticism over which was the real clerical error is
understandable. Having first given the proposal a rating no worse than Acceptable,
did the SSEB err in assigning it a Marginal rating in the final report? While
evaluators may change their minds, they risk a finding of arbitrary decision making
when such a change is not explained. *See Fort Carson*, 71 Fed. Cl.at 596. In this
instance, however, the Court finds that SOCOM is saved by its sloppiness. Because
the initial evaluation was inconsistent in two vital respects --- the rating could have
been Good or Acceptable, and the Gossage matter could have been a weakness or a
significant weakness --- the SSEB's opinion at that stage cannot be determined.
The final evaluation documents show that the SSEB apparently concluded that it
was right to have described the concern over Mr. Gossage's duties as "appreciably
increas[ing] the risk of unsuccessful contract performance," and accordingly
determined this was a significant weakness. AR at 1557, 1581. The premise of the
rating was thus clarified, justifying a new rating of Marginal. The Court notes that
the other two offerors who were found to have a significant weakness under this
sub-factor received no better than a Marginal rating. *See* AR at 1518 (Offeror B
rated Marginal), 1530 (Offeror E rated Unacceptable).

Regarding the use of the definition for an Outstanding rating in the Annex L document, it is not plausible that a rating would *increase* upon the finding that a weakness was in actuality a significant one.  Since that definition is inconsistent with all of the other findings in that document, and is contradicted by the definition employed in the main report, *see* AR at 1556, the Court concludes that its inclusion was, indeed, a clerical error.  In employing the APA standard of review, a court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman Transp.*, 419 U.S. at 286.  This is such an instance.[32]

In any event, there is no basis in the record to conclude that the SSEB initially intended to assign a Good rating to Res Rei under this sub-factor, when the definition for Acceptable was stated, and the color for the latter rating was used twice in the Appendix L document.  *See* AR at 1440–41.  A rating of Good means the "[r]isk of unsuccessful performance is low," AR at 1090, which conflicts with the finding that the Gossage concern "appreciably increases the risk of unsuccessful contract performance," AR at 1441.  Even if plaintiff were correct that the SSEB arbitrarily changed the rating, an Acceptable rating for this sub-factor would not have given Res Rei a substantial chance at being included in the competitive range.  Four offerors with higher ratings and lower costs were excluded --- Offeror H (Outstanding for Sub-factor 1, Acceptable for Sub-factor 2b), Offeror J (Outstanding for Sub-factor 1), Offeror A (Acceptable for Sub-factor 1, Marginal for Sub-factor 2b, Substantial Confidence for Past Performance), and Offeror O (Good for Sub-factor 1, Acceptable for Sub-factor 2a, Substantial Confidence for Past Performance).  AR at 1604–06.  Thus, such an arbitrary decision would not have been to plaintiff's prejudice.  *See, e.g.*, *Croman Corp. v. United States*, 106 Fed. Cl. 198, 220–21 (2012) (explaining prejudice determination requires comparison with proposals not selected), *aff'd* 724 F.3d 1357 (Fed. Cir. 2013); *Westech Int'l Inc. v. United States*, 79 Fed. Cl. 272, 300–02 (2007) (finding correction of errors would not have sufficiently raised protester's rating); *Bean Stuyvesant, L.L.C. v. United States*, 48 Fed. Cl. 303, 333 (2000) (same).

In sum, the Court finds that SOCOM did not act arbitrarily and did not violate any statutes or regulations in evaluating Res Rei's proposal and excluding Res Rei from the competitive range.  Accordingly, the government's motion for judgment on the administrative record is GRANTED and Res Rei's motion is DENIED.

---

[32]  Plaintiff also bases a claim of bias on these discrepancies in the Sub-factor 1 evaluation.  Pl.'s Br. at 34.  Such errors are not sufficient evidence of bias.  *Info. Tech. & Appl'ns Corp.*, 316 F.3d at 1324 n.2.

### III.  CONCLUSION

For the reasons set forth above, defendant's motion for judgment on the administrative record is **GRANTED**, and plaintiff's motion for judgment on the administrative record is **DENIED**.  The Clerk shall enter judgment for defendant.

**IT IS SO ORDERED.**

s/ Victor J. Wolski
**VICTOR J. WOLSKI**
Judge